Case number 23-1372 Mark Bambach et al. v. Gina Moegle et al. Oral argument not to exceed 15 minutes per side. Neal Giovinatti for the appellant. You may proceed. Good morning, your honors. May it please the court, Neal Giovinatti on behalf of the defendant appellants Gina Moegle and Suzanne Shaw, excuse me. Your honors, I'd like to request five minutes for rebuttal. The issues before the court today are relatively straightforward in this matter. Would a reasonable CPS worker have understood what actions by a parent would constitute the revocation of that parent's consent to have their child placed outside of their care pending a CPS investigation? The answer to this question is no. There's no precedent that would clearly establish what actions by that parent would revoke the consent and thereby trigger the Fourth Amendment and Fourteenth Amendment protections at issue in this case. As a result, qualified immunity would apply, shielding Ms. Moegle and Ms. Shaw from liability here. Focusing on two points today, your honors. Did you really go beyond that and say that this is controlled by Williams-Ash anyway? Yes, your honor. The Williams case or the Smith case is certainly directly on point with the the actions of the CPS worker in this case. The Smith case does not clearly establish any law that would demonstrate what would require or what would constitute constitutional violation. Because in the Smith case, of course, they said what wouldn't constitute a constitutional violation. What actions would not entail revoking consent by a parent in this situation? Accordingly, your honor, the Smith case is controlling here. What I'm confused by is are you arguing a factual argument or a legal argument? So we have a lot of Fourth Amendment cases involving uses of force and we have a lot of cases saying it's clearly established that a police officer's use of gratuitous force when there's no safety needs is a violation of clearly established Fourth Amendment law. And then we have a lot of circumstances about what what the facts were and we say those facts are for the jury. So why don't you at least concede that it's clearly established that without consent you need to follow the various procedural protections that would apply before the state takes somebody's child away from them? Yes, we do not dispute that. If that's true, why isn't this just a question of fact about whether he consented or not? There's no dispute about whether there's no there's no question about whether he consented. The question is. Well, withdrawing consent. Maybe you could say that it's not clearly established that you can withdraw consent. But if you think it's if you think it's clearly established that without consent you cannot take retain somebody's keep somebody's child from them, then then isn't it just a fact factual dispute about whether he withdrew his consent? I might agree with you that what he did was not enough under our summary judgment standard. But that question would you know, we have a whole set of jurisdictional stuff about these types of factual questions aren't up on interlocutory appeal. So your honor, we focus specifically on the second prong of the qualified immunity analysis, the clearly established prong, to avoid the factual situations that might impact the first analysis whether there was in fact a constitutional violation. And and I do think that there is there would need to be case law demonstrating what is required to revoke consent. It's obviously a different question about whether or not the individual consented than whether or not they subsequently decided to revoke that consent. What if what if changed the factual hypothetical to he expressly says I am withdrawing consent, give my children back to me right now. So your honor, I think... Would that be clearly established violation? So based on the Smith decision, I think at least on to the first part of the clearly established test, you likely would get past that. But frankly, your honor, no, I don't think that there is a case that has decided that if you expressly revoke consent, that that would constitute, that would trigger the constitutional protections. There's never been a case from this circuit, from the Supreme Court, or from the district court relevant to this case, that has said that that would be a violation. I think the argument at least could be made in that situation that Smith may have clearly established. Yeah, I see your point that maybe there's a difference, but why I mean this all is a level of generality game. If you if you interpret the clearly established law as continuing consent or something to that effect, then it would be potentially enough. That strikes me as quite quite a far-reaching rule on your behalf, that the state can continue to keep somebody's child even after they expressly withdraw their consent without some type of hearing. So your honor, that's obviously a different factor, and that's not before... But it's the legal rule in effect that you're advocating for, isn't it? That it's not clearly established. I think you just conceded it. It's not clearly established what is required to revoke consent. I think that would be our position. I get that in a situation where a parent maybe says, I am withdrawing my consent. I want my kid back immediately. That might fall under the, there's a something could be clearly established if it's so clearly obvious that that would be a trigger constitutional protection. It might fall there. So is that the state's position that if, I mean, I guess I'm where Judge Murphy is, like there's a legal question and a mixed question maybe. The legal question would be, if a parent clearly revokes consent, is it clearly established that the constitutional provisions are triggered? So and I've heard you say both, yes, that is clearly established, and no, that's not clearly established. I guess maybe I'll put it this way, Your Honor. I don't know that I have a position on that specific question, because that's not the question before the court today. That there wasn't explicit revocation of the consent by Mr. Bombach. That's what I was going to ask. If, I mean, we can we can change the question here and ask you a bunch of hypotheticals. But I thought the question was a narrower one as to whether it was clearly established how you on a couple different occasions, and could somebody know from case law that that was sufficient to be an implied revocation of consent? That's exactly the question before the court, Your Honor, because there was not that explicit revocation by Mr. Bombach in the facts before this court. And you think that we have to get to the clearly established question on that question, because ultimately what facts constitute an implied revocation of consent is a legal question? Yeah, it's a legal question as to whether there's precedent clearly establishing what is required for a caseworker in this situation. If there is a continuum on a parent has consented, then there's the continuum of they want to revoke. The parent can do nothing. Obviously that, I assume we would all agree, that is not revocation. But then at the opposite end, there's the parent being super clear. I've expressed, I'm revoking my consent. I'm filing lawsuits against you. I'm going after CPS. That, on the continuum, there has to be a line drawn somewhere in the middle there where the actions by the parent would therefore constitute revocation, and therefore the constitutional rights at issue would be triggered. We don't have an answer as to where that line is in the middle, and that's the point of the argument here, is that because we don't have that line, an answer as to where we are in the continuum triggering those constitutional rights, it would not be clear and not be appropriate to hold Ms. Mogul to a standard that has never been established by this court or by any other court. And that draws support from the excessive force cases because it's like the question, is this amount of force excessive in relationship to the threat that was posed in these circumstances? There's certainly parallels in that regard, Your Honor. The Supreme Court cases, and there's a dearth of them, or just a wealth, a wealth, that's the word I was going to say, a wealth of them in the last 10 to 15 years from the Supreme Court, overturning decisions on this particular point requiring very specific case law to establish a clearly established right. While those cases primarily focus on excessive force cases, it's not specifically limited to excessive force cases, and the general principles that the Supreme Court has repeatedly stated in these cases are applicable to this case. Do you think it matters? I'm confused, going back to Judge Larson's point about what is factual and what is legal. In the excessive force context, the mixed question at the end, when you have all the established facts, I think the court has said is a legal question that we review de novo. But we do have precedent for the idea that a district court's finding of consent for a search, say, under all the circumstances, is a factual question that we would review for clear air. I just wonder, does that matter? Because that strikes me that this mixed question here about whether his comments were a revocation was more a factual question, or at least under that idea that consent is a factual question. So we have two clear facts that aren't in dispute, that one, Mr. Bombach consented initially on December 25th, 2015, and that he never explicitly revoked that consent at any point. There's not a factual question for what kind of happened in that middle range. While it might not be clear exactly what was said on these phone calls between Ms. Mogul and Mr. Bombach, it really is irrelevant to the purpose of the second question of the qualified immunity analysis, because there is no case law establishing that standard, the middle point on that continuum. So the specifics of that conversation, really, it doesn't really matter about the facts of that, because that the law isn't established on, or the point of clarity of where on that standard, sorry, I'm all over the place here, where in that continuum the standard would apply. And I think that if we look at the cases cited by the plaintiffs and by the district court, and I'll note that the district court's decision addressing the summary judgment order, or in its summary judgment order, does not even really do this analysis at all about what, whether there's a clearly established right here, which I think on that basis alone would warrant reversal and remand. But we don't need to get to that point, because there is no case law cited by the plaintiffs in their briefing, either before this court or before the district court, which gets to this question of where on the continuum is a plaintiff's conduct constitute revocation of consent for purposes of constitutional protections. All right, I see your light is on. Oh, I apologize. So unless my colleagues have questions, thank you. Argument will hear you on November. Good morning, your honors. Brian Garner. May it please the court, Brian Garner and along with my colleague Maria Holbecki, appearing on behalf of Mark Bomba and his two minor children, E.B. and M.B. A pundit has uniquely framed this and wants you to narrowly interpret it with very strict facts. But I'm going to ask you to look at it and step back and we analyze it under what the Macintosh versus Klaus standard. And that's as of the date of the violation, what was the state of the law and did that state of the law give the state actor fair notice of what they're doing as a constitutional violation? And when we're analyzing this, there's some... What case do you rely upon that you say gives clear notice as to what the the test is for an implied revocation? Yes, your honor. Well, there's a combination of cases with regard to consent and revocation. The first case is the Smith versus Williams-Ash. In that case, it was established that you can revoke consent and if you revoke consent, you got your kids back, right? But they weren't the facts, they weren't analyzing the facts. The second is an unpublished case of this court, Farley versus Farley. In that case, the mother did do things, conduct, she didn't expressly say, but she said did conduct, hired an attorney, said she wanted her kids back, things like that, which is very comparable and exactly what my client did. He contacted Mogul and said, what am I getting my kids back? He said, I'm not speaking with you. I'm not cooperating. I'm pleading the fifth. I'm going to hire an attorney to get my kids back. Now, when I think about consent, consent to me means I agree, I'm authorizing it, right? I'm failing to understand how I'm getting a lawyer to get my kids back wouldn't be revocation of consent. So on the genuine issue of material fact, I'm not certain that rises to the level of a Rule 56 showing of consent because you would concede that Mr. Bamba already consented. Mr. Bamba did initially consent. If I was the caseworker, I would just be like, okay, he wants his lawyer for the eventual hearing we're going to have. It doesn't mean he wants his kids, his children back immediately. I think, I think it was the conduct and way, in the way Mr. Bamba contacted Ms. Mogul and that he did. I'm getting a lawyer to get my kids back. And there was a statement that she made to him. He didn't get a lawyer, or at least if he did, the lawyer didn't contact the caseworkers until at least the time of the initial hearing, right? My understanding is he was trying to hire an attorney prior to that and that he did get an attorney prior to that. But it was very close to the hearing date. But did either he or the attorney contact the caseworkers to make clear what he wanted after the first couple exchanges that happened right after the consent was given? I can't tell you what the previous attorney did, Your Honor. I apologize. I don't know that answer. Yeah, you can't hold the caseworker to knowledge about what the attorney did if he didn't contact the caseworker, can you? But again, I don't think it's the attorney. I think it's Mr. Bamba's conduct itself. I think there was a statement that she, Ms. Mogul made to him. Why would, I'm not going to talk to you. I'm going to get an attorney. I'm going to plead the fifth. How do you read into that implied revocation of consent to get the kids back immediately? It seems like the more obvious inference is the opposite of that. I think, I think, Your Honor, there's a little bit more to what he said. I'm going to hire a lawyer. I think he said I'm going to hire a lawyer to get my kids back. And I think that was a statement that's in her report that she did, so it's their statement the way she interpreted it. But I think that's the issue. But additionally, he had a telephone conversation, which was in the deposition he testified to, that she told me if I try to get my kids back that they're going to get some kind of protective order. And so I think that also clearly tells Ms. Mogul that she knows he's revoked his consent. And I believe that's in the brief, the facts are cited in that brief, and it was cited in summary judgment. But I think, I think one of the things that the court was hitting on earlier is when we're analyzing this type of case. I mean, again, maybe, maybe it does. I'm hiring a lawyer to get my kids back. But it could also mean I'm hiring a lawyer to get my kids back at the end of this legal process. I want to have my children back, but in the meantime, I'd like them to stay where they are. I mean, the children have to be somewhere, right? So during the legal proceedings. Yes, Your Honor, but I think when you combine that with the conversation that he had with Ms. Mogul that we cited, where she said if you try to get your kids back, we'll get a protective order against you. I think those two things clearly show that she knew there was revocation. Okay. And again, when we're analyzing this question, we have to look at... Why does that clearly show that when she's speaking about a future event? If you do something, then we'll do something. Why does that constitute immediate express or implied revocation of consent? I'm not following your argument. So if Mr. Bamba left the meeting with her and went and picked up the kids, then she would get a protective order against him to stop him from doing that. When I think the real thing they should have done was got a warrant from the court, an order from the court from the beginning, instead of waiting 21 days. But I think that's really the issue. I think that she knew by that statement and by that conduct, I think it's pretty clear that he did revoke his consent. I don't think that... Again, when we're talking temporarily, you're saying that if he went to the ex-wife's house and took the kids, that would clearly be revocation. That makes sense. But saying if you do something, then this is what we'll do. Why does that constitute his immediate implied revocation of consent? Because he didn't do what it is she was threatening him not to do. I think he didn't do because he thought of the fear of what would happen to him. And I think that's the reason the conversation came up, is because he told her he wanted to get his kids. And I think she said, if you try to get your kids, we're going to get a protective order. And I think he got scared because he didn't know the law. He's just a layman. And I think at that point he backed down. And I think that's what my client would testify to. I don't have the deposition to cite of that language in front of me, but we did cite in her brief the language she did say where she told him she would get a protective order if he tried to get his kids. No. What case would clearly establish that that set of facts should have alerted the social worker that he was impliedly revoking his consent? I mean that seems to be the sticking point for you, even if we were to agree with you. Yeah, so yes, so we have several factors here. One, the court has said that in U.S. v. Lanier, that we don't need very strict factual specificity. It's also said that you can find clearly established in a very novel circumstance, right? And I think it was Hope v. Pelzer. We're not asking for that. We're looking at a middle ground. And I think the middle ground, when you're talking about the cases cited, these excessive force cases... But if you're in the middle, isn't that a problem for you? I feel like if it's the clear case, Hope is about the obvious case. So, you know, I think that was like somebody, they kept the prisoners in their own feces in a jail, like strapped to the wall, or I don't know, some parade of horribles that was really horrible, and there was no case because nobody had ever done that before. So that's the one end. But if you're in the middle, that seems to be where that works to the state's advantage. Your Honor, I think that was inartfully stated. I apologize. I see your point. We're arguing that it is closer to this side, but there are cases that are more analogous than the cases cited by the state actors. The cases they cited... You have to cite a case. And I will, Your Honor. I just want to point out that they cited cases that are very fact-specific, that officers have to make split-second decisions in the moment, right? And so, yes, very fact-specific cases. We need that in that circumstance. We don't need that in this circumstance. They had time. They had time to deliberate, think, right? So I think that we can look at cases like Barbara v. Miller, Kovacic v. Cuyahoga County, and where they say that if you want to take a kid, you need a warrant, absent, consent, or exigent circumstances. We know there's no exigent circumstances here because there's 21 days. 21 days to get to the court. Exigent circumstances would be, I got to go to court tomorrow and get a court order, right? But... I'm completely missing that. They get this allegation that he had abused them. They contact him immediately and he consents to have the girl stay with his ex-wife. It seems to me they acted very expeditiously. But the expeditiously would be getting a court order if they're taking the kids. That's the expeditiously I'm talking about. What did he say that, in your estimation, should have caused them to change their plans and go get an immediate order because he's withdrawing his consent? I think the conversations that we're talking about, one, that he says, I'm hiring a lawyer to get my kids back, and two, the conversation that where Gina Mogul told him, threateningly him, if you try to get your kids back, I'm going to get a protective order against you. At that point, I think she clearly knew that he wanted his kids back and he was not consenting this. Now, you have to understand... You're taking a little liberty, I would say, with his answer about getting the kids back because, and there may be other parts of the deposition that I'm missing, but he asked her whether he could see or talk to the kids and then her answer that I think you're paraphrasing, and then she made it clear that if I tried to contact them or see them or anything that she would take out a PPO. That's quite different than saying if he went to pick up the kids after having given consent to stay with his ex-wife. I understand your point, Your Honor. I do, and I apologize for that, but I think there may have been more of the conversation, but yes, I think that he did say, I wanted to see my kids, I want my kids, and then she said, if you do, we're going to get an order against you. But then immediately after that point, at least in the deposition, as it's lining this up chronologically, there was a discussion about, will you talk to the police? Can we interview you? And he said, no, I'm not talking to anybody without counsel. I think... He didn't get counsel for about another seven or eight days. Now, we have to remember, Your Honor, this was over Christmas and New Year's. Right. And they showed up at his house on Christmas Day, the day he was supposed to get his kids back, and he's thinking he's getting his kids back, and another woman is at the door saying, hey, by the way, there's allegations against you. He was shocked, one, in the way of the Christmas holiday. He says that he thought he'd get them back in a couple days. He did. He said... Not immediately, that there would be an investigation. They'd find out he didn't do anything, and he'd get the kids back. Right. That's what that was his initial thought. He says, okay, I'll check. That period ends. A couple days goes by that he thought, within which he'd get the kids back. It just seems so simple here, that if he had just called and agreed to talk to the caseworkers and said, I've thought about this more. I didn't do anything. I want the kids back. I want them now. Your Honor, I see your point. And he didn't say that, did he? And you can make an argument that he inferred that, but the question is, did he say that? No, he did not expressly state at any point that I revoked my consent. I want my kids back. So why are we spending all this time trying to figure out whether these caseworkers should have understood that he was implying something that was so easy to say, that he didn't say? That just seems like an unfair burden to impose on the caseworkers. I don't think people in that situation are thinking in legal terms of, I need to now revoke my consent. He was the father of this child who was raising up about legal consequences to say, I won't talk to anybody. I need a lawyer, and when I get a lawyer, I'm going to plead the fifth. And again, Your Honor, the three or four days after, New Year's holiday, there was a whole holiday situation, and I think that's what caused him to delay in getting an attorney. But I think it didn't even matter at that point, because Ms. Mogul said in her report, before she even talked to Mr. Bamba, she told the mother, Amy Bamba, that she wasn't going to let the kids go back to him anyway. What do you, I think you just conceded that there wasn't an explicit revocation. The state cites the paragraph of Smith v. Williams-Ash where the court says in order to withdraw her consent, she needed to explicitly withdraw the consent they explicitly gave. So I don't, I mean, maybe the law is unclear on what you need to do, but I think there's a pretty good argument that after that case, you need an explicit withdrawal. And so how would you distinguish Williams-Ash, especially on prong two of qualified immunity, that it's clearly established? I mean, you can make a pretty good argument that Williams-Ash suggests that you need an explicit revocation. I think that was the ruling in that, but there's also the factual similarities to our case with the Farley v. Farley case. And I know it's unpublished, but I think that's very persuasive. I think it's very persuasive in this because the things she did that the court said were enough that a reasonable jury could find that he revoked his consent are almost identical to the things that my client did in this case. So you've got two cases. They're seemingly distinguishable, one from the other. One says one thing, one says another. Where does the combination of those two cases, assuming they stand for what you say they stand for, make the law clearly established? I think the combination of the two cases is, one, you have the spectrum, like the opposing counsel was saying, a clear revocation, right, in consent. But I think that's the correlation. There is a middle spot in that, and that's the spot that is the gray area. That's the spot that's more factually significant, right, and that gray area is conduct. And conduct isn't here that the only place that we ever use conduct. We use conduct in a lot of different situations in the law, and so it's a very common thing that we've done. But conduct, by the course of conduct, by that person's conduct, you should know or could have known, it was reasonable for you to know, that he revoked his consent. And that's why I really think that this is a fact question. I think you make a really good argument, but the point is, how would the caseworker know where these facts fall on this continuum when no case other than Smith seems to answer that question? Your Honor, I think that we always say things like we need to err on the side of caution. Erring on the side of caution is following the court procedure, using the standard of probable cause, getting a hearing, and letting the judge determine that. Well, they got a hearing, and the hearing was, as you point out, you've got two holidays in the meantime. It seems to me this was a pretty short investigation period before you got a hearing. It's not like three months went by or something like that. It's 21 days, Your Honor. The law says that if you can't take someone without a warrant, meaning you have to have a hearing or court order, unless there's exigent circumstances, and the exigent circumstances is, well, how long does it take to get a court order? I know they put petitions together a lot faster than that. But the argument you're making is absent consent. Consent changes that. So when the conduct happened at the end of December, at that point, based on the facts that we're stating, which in this type of hearing they have to concede in the most favorable light of us, it was at that point that she should have known she needed to get a hearing. And that was still the 1st to the 14th. They could have been in there the first working day of the year, and they weren't. They chose to wait 14 days into the year, 21 days from the date of Christmas. So I think she hired a lawyer. I think the record shows January 4th, but I'm not certain of that. Let's just assume for a moment that that's the case. Did the lawyer ever request a more immediate hearing because of the fact that this guy had lost his kids and wanted them back? I don't think he did, but I don't know if that's the standard. I know that would show revocation, but I still don't think that's a standard. I think his conduct can show the revocation, and I think that's what we have to look at is his conduct. Any further questions? All right, I see your light is on.  Thank you. We'll hear rebuttal. Thank you, Your Honor. Just briefly addressing Farley. Farley is, as the court identified, an unpublished case, and the case law is quite clear that an unpublished case cannot establish a clearly established right. And for that reason alone, Farley is irrelevant to the specific issue before the court today. Farley is also quite factually distinguishable. If we go back to that continuum, the conduct by the mother in Farley is about as close as you can get to explicitly saying, I want my kids back. In fact, she called the supervisor, as the record in that case shows, and demanded to have the kids back immediately. So that is factually distinct from what we have in this case. The mother in that case even called the police to try to get the police to get the kids back from CPS. So Farley is distinguishable, and as this court has addressed, the Smith case is far greater on point. I wouldn't be to ask that the court reverse. Thank you. Thank you. All right. The case will be submitted.